Ranney, J.
The record in this ease presents the same state of facts, and the suit is brought to recover the same lands, as in the case of Lessee of Sellers v. Corwin et al., decided by the Supreme Court in 1835, and reported 5 Ohio, 398. The present defendant, Benham, holds under Sellers, the lessor of the plaintiff in that case, and defends upon the same title. Each of the parties claims under a judicial sale of the lands in controversy, as the property of one Win. Eerguson—the lessors of the plaintiff, in virtue of a judgment in favor of the Lebanon Bank v. Ferguson et al., recovered in Warren county, August 14, 1821, levied February 8, 1826, and' a sale made on the 3d day of April, in the same year—the defendant, *under a judgment in favor of the Bank of the United States, recovered in the circuit court for the district of Ohio, January 8, 1822, levied August 20, 1823, and a sale made August 9, 1831. No exception is taken to the regularity of the proceedings in either case; but it should be further stated, that the Lebaanon Bank judgment was enjoined from September, 1823, to December, 25, 1825. It thus appears, that neither judgment was levied within a year after its rendition; that the judgment in favor of the Bank of the United States was first levied, and shortly before the Lebanon Bank judgment was enjoined; and that the sale under the latter judgment was first made. The question is, which salo conferred the better title ? Upon this state oí facts, the court, in the case to which I have referred, held, that the judgment rendered in the circuit court was a lien upon the lands of the debtor throughout the state, in virtue of the adoption by that court of the execution laws of the state, for the regulation of its practice ■ and that, as between judgment creditors, where a year transpires without a levy by either, the execution first levied thereafter, would *34 •obtain, the preference. The correctness of this ruling is denied by the plaintiff’s counsel, and we are asked to review it. They insist that no such lien existed ; but, if it did, and both judgments had been recovered in the state court, they claim that the lion of the Lebanon Bank would have been paramount, and should have been preferred.
Many questions, involving the construction of the judgment and execution laws of that period, are very ingeniously discussed, which we do not find it necessary to decide; nor do we find it necessary to determine whether a judgment of the circuit court, at that time, created a lion upon the lands of the debtor.
The judgment liens are the creations of positive law, without which they can not exist, and that they can not survive the law which gives them being, are principles too well settled to be drawn in question. I suppose it equally clear, that they must be created by the government under whose ^authority the judgment is rendered. The state may determine the effect of its own judgments, but can not affect those rendered by the courts of the United States; while the same limitation is equally true of the legislation,of the general government.
Each has an equal right to provide for the security and satisfaction of judgments rendered in its courts; but neither has any power whatever to limit this sovereign right in the other.
In a system as complex as ours, with two governments extending •over the same people, it is easy to imagine conflicts of authority. They can only be avoided by confining each strictly to its own appropriate sphere of action, and by the exercise of that mutual forbearance which arises from regarding each as equally entitled to our affection, confidence, and respect.
The state did provide for the lien of its own judgments; and the court found, that the general government had also provided for exactly the same lien for judgments rendered in its own courts, by .adopting the provisions of the state law. If this was correct, there could be no conflict. Each having an equal right, has given the same lien, subject to the same modifications and contingencies; and in each the lien exists in virtue of the legislation of the government under whose authority the judgment was rendered, and the effect was to place them upon the same footing in all respects. 'The rights of each creditor being referred to the same enactment, it is only in this view of the to construe in order *35 to determine which has the better right. By the act of 1820 (2 Ch. Stat. 1144), in force when both these judgments were rendered, a lien, is given upon the lands of the debtor lying within the county, from the first day of the term at which the judgment is rendered, and which would continue until the judgment became dormant. No obligation to take out and levy an execution in order to protect the lien as against other judgment creditors, is found in this law. This act was repealed by the act of February 1, 1822 (2 Ch. Stat. 1233), without any ^saving of the liens created by it. This latter act expressly required the creditor, in order to continue his lien as against other judgment creditors, to cause his execution to be levied upon the property within one year, unless he was unable to do so' by appeal, injunction, etc., and in default to do so, expressly provides, that “ such judgment shall not operate as a lien on the debtor’s estate to the prejudice of any other bona fide judgment creditor.”
In McCormick v. Alexander, 2 Ohio, 73, it was held, and correctly, that this provision extended to judgments rendered before as well as after the passage of the act; with this difference: those rendered before, were required to be levied within one year from its passage, and those after, within one year from their rendition. No execution was taken out upon either of these judgments, and levied within one year from the passage of this act. The consequence plainly was, that each lost its lien as against the other, and both as against other bona fide judgment creditors. But the loss of the lien of the judgment did not destroy its capacity for execution. That would continue until it became dormant; and when issued it might be levied upon any property subject to its satisfaction. This property, after June l, 1823, was liable to be taken to satisfy either judgment, without any prejudice from any lien created by the other. On the 20th day of August, 1853, while the property was so liable, and before the judgment of the Lebanon Bank was enjoined, the Bank of the United States took out execution on its judgment, and levied it upon the property. This levy created a specific lien upon the property, and by virtue of this levy alone, and not from the lien of its judgment, the Bank’ of the United States obtained the preference. But it is claimed this advantage was taken away by section 17 of the act of February 4, 1824 (2 Ch. Stat. 1301). This section provides “that no judgment heretofore rendered, or which hereafter may be rendered, on which execution *36 shall not have been taken out and levied before the expiration of’ one year next after the rendition of such judgment, shall operate-as a lien *on the estate of any debtor, to the prejudice of any other bona fide judgment creditor.”
From this, and the repealing cause of this act, it is urged that the execution act of 1824 repealed all former execution laws, and brought both these judgments under its operation ; that their respective liens, priorities, and levies are to be governed by that act; and that section 17 of said act, in express language, took from the-United States Bank judgment, as against the Lebanon Bank judgment, the priority it had acquired by its levy of August 20, 1823. And as neither judgment had been levied within one year after its-rendition, both judgments, as against each other, were put on a perfect equality, though one had not been levied at all, and the other-had been levied after its year had expired. That in order to obtain a preference, a new levy must have been made after the taking effect of that act, and before the levy made by the Lebanon Bank.
That this act did apply to judgments rendered before its passage, and in many cases destroyed existing liens and changed priorities,, is not only manifest from its terms, but was so decided in McCormick v. Alexander, 2 Ohio, 70; Executors of Waymire v. Staley, 3 Ohio, 367, and Shuce v. Ferguson, Ib. 137; and it was further held, that the act in this respect was constitutional.
But the question here is, did it also destroy existing levies? In its terms it certainly goes no further than the judgment lien—it “ shall not operate as a lien on the estate of any debtor,” etc.; and' the very levy sustained in the case of McCormick v. Alexander, was-made long before the passage of' this act, and the sale afterward. But the last part of this same section shows conclusively that the-legislature did not intend to affect prior levies. It is there provided, that “in all cases where real estate has been, or may hereafter be taken on execution and appraised, and twice advertised and offered for sale, and shall remain unsold for want of bidders, it shall be the duty of the court from which such execution issued, on motion of the plaintiff, to set aside such appraisement, and order a new appraisement, and award a new execution *to issue, as-the case may require.” See Riddle v. Bryan, 5 Ohio, 53. With such unequivocal evidence of intention to preserve levies, it would not become us to say that it was intended to destroy them; and we- *37 .•are therefore of opinion, that the priority obtained by the levy of 1823, was not affected by the act of* 1824.
This disposes of the case upon one ground assumed by the ■plaintiff’s counsel; supposing the judgment of the circuit coiirt to •stand upon the same footing as a judgment rendered by the state court.
But they contend that it is not entitled to this position, and insist that it created no lien whatever upon the lands of the debtor, and that the contrary opinion expressed in 5 Ohio is not law. For .the purposes of this case, let this be conceded, and we are still ■brought to a conclusion adverse to the plaintiff in error. Whether the judgments of that court operate as liens or not, it has not been ■doubted that it had the power to issue the necessary process of execution to enforce satisfaction of them. This process might be levied upon any property of the debtor liable to be sold for that .purpose, subject to the paramount liens of other creditors.
Such paramount liens could only exist in virtue of the state law in force when the execution was levied. The law in force at that ■time gave the judgment creditor a lien for five years against the debtor and his grantees, but only one year against “ any other Iona fide judgment creditor,” who might first, thereafter, levy upon the .property. More than one year having elapsed, the lien of the. Lebanon Bank has ceased to “ operate on the estate of the debtor,” to the prejudice of the Bank of the United States—a “ bona fide judgment creditor,” with power to levy upon the land, and actually .making such levy.
But it is said, this provision was not intended to apply to any but judgments in the state courts, and it was so considered in Sellers’ Lessee v. Corwin. But why so narrow a construction? Not, certainly, from the language employed. Tb at is as broad as words can make it. If a creditor bringing *his action in the circuit court, may be a “ bona fide judgment creditor,” he is directly and clearly within it. I am aware that the usual import of words is sometimes to be restricted, when it would otherwise obviously extend beyond the subject-matter and spirit of the whole enactment. But this can not be done, because the legislature did not foresee or contemplate every case upon which it might operate.
The wisest legislators would fall far short of such foresight. If within the language, it must appear clearly to the court, that the ¿ease would have been excluded from its operation, if foreseen. *38 The object and spirit of the law are manifest. It intended to give? a creditor security for his judgment, until with reasonable diligence he could enforce it by execution; but it did not intend to enable him to lock up the estate of the debtor, as against his other creditors, longer than to serve that purpose. It favored the vigilant, but made no truce with negligence and delay. It was known to the legislature that the courts of the "Union wore constantly rendering judgments in favor of creditors as well entitled to justice and right as those who pursued their remedies in the state courts. To ascribe to the members of that body an intention to place obstacles and impediments in the way of the one, that did not exist, in the other, would be a very poor compliment to their sense of justice, and to suppose them actuated by a narrow jealousy entirely inconsistent with enlightened and liberal legislation.
Nor is this, in the most remote degree, an attempt to legislate for the federal courts. It is simply saying to the creditor in the state court: “"We protect you but one year against any other creditor having a right to levy upon the land. "Whatever rights his judgment gives him, either under the state or national laws, you shall not longer stand in the way of.” '
In any view, therefore, of this case, we are of opinion that no lien existed by the state law in favor of the Lebanon Bank at the time-the United States Bank levied its execution *against the latter; that that levy gave a specific lien upon the property for the satisfaction of the judgment, which remained unimpaired down to the time of the sale, and consequently appropriated the land as against the former judgment.
One other point is made. It is said the sale made under the-Lebanon Bank judgment vested a perfect title in the purchaser,, discharged of all prior liens and levies, and that the only remedy left to the Bank of the United States was in having the money arising from the sale applied upon its judgment. The contrary was directly decided in Riddle v. Bryan, 5 Ohio, 55, and Sellers’" Lessee v. Corwin, Ib. 398, and has, so far as we know, been regarded as the settled law of the state for many years. If the question were doubtful, we should not feel disposed to disturb it, when so many titles, taken upon the faith of those decisions, might be-endangered. But we think these decisions correct .in principle. The rule of caveat emptor applies in all its rigor to purchasers at judicial sales. Such a purchaser, therefore, takes the property *39 subject to every lien, either by judgment or levy, that could be asserted against the creditor upon whose judgment the land is sold.
A majority of the court are of opinion that the judgment of the court of common pleas should be affirmed.
Judge Corwin did not sit in the hearing of this cause.
Judge Bartley dissented.